UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

CHRISTOPHER CLOUSTON,                  :
MARSHALL McGUIGAN

    Plaintiffs                         :      CIVIL ACTION NO.:
                                   01-CV-2404 (DJS)

vs.                                    :

ON TARGET LOCATING SERVICES,           :
ENERGY EAST CORP. and THE
UNION WATER & POWER COMPANY            :      JULY 2𝓎 , 2003

### MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF, MARSHALL McGUIGAN

## I.   INTRODUCTION

Plaintiff, Marshall McGuigan, respectfully submits this Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. Plaintiff urges that Defendants' Motion is a carefully crafted fairy tale based upon "facts" which are anything but, and supported by Affidavits which purport to be based on personal knowledge but which, in fact, are not.

## II.  FACTS

Plaintiff, Marshall McGuigan, joined Defendant, On Target Locating Services[1] as a locate technician on February 6, 2000. At all relevant times, McGuigan resided in

---

[1] Defendant On Target Locating Services is a division of the Union Water & Power Company, which is a subsidiary of Energy East Corporation. Unless otherwise noted, Plaintiff will refer to them collectively as "Defendant".

Westerly, Rhode Island. McGuigan, along with other locators who began employment with On-Target in February of 2000, was assured that he would be provided with a choice of health insurance coverage, including HMO and PPO options. (Ex. 6, 11, 18, 36). McGuigan and the others were told that because the company moved into Connecticut so quickly, only a $500 indemnity policy would be available initially but that HMO and PPO options would be available "within six months." Ex. 6 at 68.) In September of 2000, the company made good on its promise to provide HMO and PPO coverage to its employees who both lived and worked in Connecticut, but not to McGuigan and others who resided in Rhode Island. McGuigan was informed that this was because of a "mistake in shopping the plan", because the person responsible was unaware that not all Connecticut employees lived in Connecticut. (Ex. 6, Ex. 36). Defendant's point person on the issue, Rena Cater, first learned of the issue herself when McGuigan and other Rhode Island residents called to inquire why they had not received their promised insurance packages. (Ex. 9, Ex. 18.) McGuigan pursued the issue without success. In February of 2001, McGuigan was told by Rena Cater that the insurance issue had been "tabled" and that the company was no longer pursuing the promised coverage. (Ex. 6, Ex. 36.) McGuigan thereafter wrote to the United States Department of Labor and sent a copy of the letter to Defendant. (Ex. 35). Shortly thereafter, McGuigan was demoted.

In April of 2000, McGuigan was promoted to a supervising lead position based upon his outstanding performance. McGuigan was the first supervising lead in

Connecticut.  McGuigan received a pay increase from $11.00 to $13.00 per hour along with his promotion. (Ex. 14 at EE00469).  McGuigan was primarily responsible for the Eastern half of Connecticut and supervised a crew of locators.  In approximately September 2000, McGuigan was asked by Jeff Melcher to assume temporary responsibility for Southwestern Connecticut (Fairfield County) in addition to his responsibilities in Eastern Connecticut.  McGuigan was told that the previous supervisor, Maurice Posey, had been removed from the position as a result of referring to an African-American employee as a "nigger".  (Ex. 6.)

Defendant interviewed several candidates for the position of Supervising Lead for Southwestern Connecticut.    In October 2000, Chris Clouston was selected as supervising lead for Southwestern Connecticut.  McGuigan was asked to stay in Southwestern Connecticut to train Clouston.  From August to December 2000, McGuigan stayed at the Holiday Inn in Bridgeport, Connecticut, returning home to his family in Rhode Island only occasionally.  During this time he was the victim of discriminatory, harassing, and retaliatory mistreatment by his direct supervisor, Tim Moore.  McGuigan also witnessed the discriminatory, harassing, and retaliatory mistreatment of others by Moore.  In addition, McGuigan was ordered by Moore to falsify time sheets to indicate employees has worked hours that they in fact had not, in violation of Defendant's published policies and procedures.  McGuigan reported these concerns to Rena Cater, Jeff Melcher, Larry LaShomb and other of Defendant's representatives.

3

On September 8, 2000, McGuigan injured himself while removing a manhole cover. He suffered injuries to his back, neck, shoulder and left arm and chest. Per company policy, McGuigan immediately reported the injury to Defendant's area coordinator, Sandy Sargeant, and was subsequently directed to seek treatment at Eastern Rehabilitation Services, which he did. When conservative treatments and traction proved ineffective, McGuigan was referred to an orthopedic surgeon, Abraham Mintz, M.D. Dr. Mintz reviewed an MRI that had previously been performed and immediately informed McGuigan his condition had previously been misdiagnosed and that he had a herniated disc. McGuigan underwent surgery to repair the herniated disc on December 20, 2000. (Ex. 6, Ex. 10, Ex. 33, Ex. 38.)

On January 24, 2001, Defendant's Risk Manager, Daniel LaBrie, and its Human Resources Representative, Rena Cater, traveled to Connecticut to have dinner with McGuigan and his wife at Foxwoods Casino. (Ex. 31.) LaBrie urged McGuigan to return to work as soon as possible, telling him:

- "it costs us more to have you out on Comp than it does when you're working."
- "We'll let you work as little or as much as you feel capable of."
- "We don't care if you drive to Newington, wave to Tim and drive home again."

LaBrie also asked McGuigan to see if he could get permission from Dr. Mintz to attend locator training on January 28 and 29, 2001. McGuigan asked Dr. Mintz for permission to attend the training, which he received. McGuigan also asked Dr. Mintz to allow him to return to light duty work, as had been outlined by Defendant. (Ex 6, 8, 10, 33, 37, 38.)

Dr. Mintz reluctantly agreed at McGuigan's urging and based upon the duties outlined

for him by LaBrie. (Ex. 37.)  During the training session on January 28 and 29,

McGuigan learned of allegations of harassment allegedly made against Christopher

Clouston.  As part of the training Rena Cater was presenting a piece on Defendant's

corporate compliance policy, and each employee's responsibility to report any known or

suspected violations.  McGuigan raised his hand and asked if that included ongoing

violations that had been reported previously.  When Cater answered "yes", McGuigan

asked to speak with her after class.  McGuigan and Clouston subsequently met with

Cater and Melcher to discuss the issues previously brought to their attention, which

were ongoing.  In addition, McGuigan stated that the allegations against Clouston were

unfounded, and that Tim Moore was the source of any harassing misconduct.

McGuigan was not told that he was in any way implicated in the harassment allegations,

nor was he instructed to refrain from discussing the situation with Chris Clouston.  (Ex.

6.)

McGuigan was subsequently informed that he was a target of the harassment

investigation.  McGuigan was interviewed by Cater and Melcher and expressed his

serious misgivings about the nature of the investigation and the fact that Cater and

Melcher were conducting it, in light of the fact that he had previously made complaints

and brought information forward without result.  McGuigan feared that he was being set

up in retaliation for expressing his various concerns.  McGuigan's concern grew

exponentially when he observed that Cater stopped taking notes when Melcher and

5

himself made certain statements. McGuigan, provided the names of individuals who could corroborate his version of events, including Sheila Ward who worked in the office every day with Moore and was herself a victim of his harassing misconduct, a fact known to Cater. McGuigan was subsequently given a written warning, a result with which he vehemently disagreed. (Ex. 6, Ex. E-1.)

McGuigan returned to light duty on February 20, 2001. His supervisor, Tim Moore, greeted his return by telling him, "you never should have come back, asshole." (Ex. 34.) Moore also told him that, "Dan Labrie might have light duty for you but I don't." (Ex. 6, 31, 34.) Moore assigned McGuigan to perform audits, which required going out into the field to physically perform locates. When McGuigan attempted to discuss with Moore whether these duties were compatible with his light duty restrictions, Moore told him to "do what I tell you to do, or else." (Ex. 6, 34). McGuigan voiced his concerns about being assigned duties beyond his limitations as well as the fact that work assigned to him made it impossible for him to attend his scheduled physical therapy appointments to Tim Moore, Jeff Melcher, Norm Rodrigue, Rena Cater Dan Labrie, among others.. McGuigan was told that this was an "operational issue" and referred back to Tim Moore. On March 8, 2001, McGuigan called Cater and told her about Moore's discriminatory and harassing misconduct and asked to file a formal complaint. (Ex. 6, Ex. 11.)

In April, 2001, the claims adjuster responsible for handling McGuigan's worker's compensation claim, Debra Buettel, called to see how he was doing. McGuigan

explained that the company was not honoring his light duty restrictions, and that his attempts to address the issue internally had been unsuccessful. McGuigan also explained that his work assignments required him to work long hours and travel extensively, which precluded him from attending his scheduled physical therapy appointments. Buettel called Dan Labrie to discuss these issues, particularly the importance of attending physical therapy. Labrie in turn discussed the issues with Moore, Melcher and others. Almost immediately, McGuigan was called to a meeting with Moore, Melcher, and Rodrigue. He was told he was being demoted for "not working as a team with Tim" and "complaining to an insurance adjuster about not being allowed to attend physical therapy." (Ex. 6, Ex. 10.)

## II.    ARGUMENT

### A.    DEFENDANT'S "FACTS" ARE ANYTHING BUT

Defendant's statement of "facts" is anything but, containing unsupported allegations and conclusions for which there is no support in the record. Moreover, Defendant presents affidavits from Lynne Toussaint and Jeffrey Melcher purportedly based on "personal knowledge" but which the record demonstrates are not. Ms. Toussaint joined the company "from outside" in March of 2001 (Ex 8 at 332), yet purports to have "personal knowledge" of events which date back at least to February of 2000. Jeffrey Melcher was deposed at length over a two-day period and replied "I don't know", "I can't recall" or words to that effect countless times, including as to some of the "facts" which he claims to have personal knowledge of in his affidavit. (Ex. Plaintiff's

Statement of Undisputed Facts ("Facts") ¶8).  It is well settled that a witness may not

rely on affidavits which contradict a witness's prior deposition testimony.  CITE

For example, Defendant claims that "McGuigan was demoted from his

supervisory position for "poor performance" (Def. Memo at 1), but provides no "facts" to

support this conclusion.  Jeff Melcher made it clear at his deposition that he lacked any

information as to McGuigan's job performance, and relied almost exclusively on what he

was told by McGuigan's direct supervisor, Tim Moore, all of which is inadmissible

hearsay. (Facts ¶8).  Moreover, Melcher was unable to give any concrete examples of

McGuigan's poor performance, other than he was unable to get along with Tim Moore

and complained about various issues which are the subject matter of this lawsuit.  The

true facts, however, show that McGuigan received pay increases, promotions, and

bonuses, clearly demonstrating that McGuigan was performing at the highest level.  (Ex.

20, 22). The facts also demonstrate that there was never any issue raised as to

McGuigan's performance until immediately after he returned from a two month absence

following surgery, and his reporting what he considered to be improper conduct on the

part of Tim Moore and others.

Defendant also claims that "In January and February 2001, the Company

conducted an investigation into complaints that Christopher Clouston, McGuigan and

their supervisor, Tim Moore had treated their subordinates in a harassing manner."

(Def. Memo at 2).  In fact, there is no evidence that anyone ever filed a "complaint"

about Marshal McGuigan. Defendant has alleged that three locators complained about

8

Chris Clouston, not Marshall McGuigan, during a training session on January 24, 2001.
Defendant cannot say who these three locators were, nor can it locate the notes Rena
Cater claims to have taken at the time. Ultimately, the claims of harassment against
Clouston proved unsubstantiated. Nonetheless, he was reprimanded and demoted.
McGuigan did not become a subject to the "investigation" until after he had brought up
allegations of improper and harassing conduct by Tim Moore, many of which he had
previously brought to the attention of Rena Cater, Jeff Melcher and others. McGuigan
and Clouston presented the names of numerous witnesses, none of which Defendant
saw fit to interview. Defendant's "investigation" instead decided to rely on the
statements of Joe Healy and Tom Krotsky, who along with Tim Moore are referred to by
Rosa Benitez as the "three musketeers" who continuously harassed and ultimately
terminated her. (Ex. 1.) Shortly following McGuigan and Clouston's demotions, Healy
and Krotsky were rewarded with promotions to supervising lead and lead locator,
respectively. The two were promoted despite the fact that Raphael Rodriguez reported
that they did very little work, and Krotsky instructed him to work slower so that he could
get more overtime. Thus, they achieved their objective as expressed to Rodriguez and
others.

      Similarly, Defendant's claims that "Plaintiff's attitude was extremely destructive of
employee morale" and that he was "not respected in the field by his employees" (Def.
Memo at 3) is completely unsupported. Not only has Defendant failed to produce
affidavits or other documentary evidence from any such employees, but Melcher himself

9

was unable to state which employees' morale allegedly suffered. Plaintiff, however, has presented affidavits from his actual subordinates at the time, which demonstrate that Defendant's allegations are false and pretextual, and that McGuigan was in fact a good supervisor who was respected by his employees. The fact that Defendant has failed to present a single Affidavit from any of McGuigan's former subordinates, many of whom are still employed by Defendant, demonstrates the pretextual nature of this argument. Nor has Defendant seen fit to present an Affidavit or other "evidence" directly from Tim Moore.

Defendant's claim that McGuigan "failed to correct his behavior following his written reprimand and he continued to exhibit poor supervisory skills and intimidating conduct toward subordinates" (Id.) is similarly conclusory and unsupported. The record is completely devoid of evidence of any performance issues between McGuigan's demotion on March 7, 2001, and his demotion some five weeks later. Nor are the "subordinates" in question identified, let alone specifics of McGuigan's alleged improper behavior. The facts do show that McGuigan was working a light duty assignment during this period of time, with a corresponding decrease in his supervisory duties. The record also shows that McGuigan received a bonus in April of 2001 (Ex. 20).

Defendant also states that "The Company became concerned that he was working too many hours and not adhering to his light duty restrictions. The company became particularly concerned upon learning that McGuigan had worked seventy-one hours in one week." (Def Memo at 4). The facts, however, show that it was Plaintiff who

10

brought his concerns about working long hours to Labrie, who replied, "That's an operational issue, you need to speak with Tim." (Ex. 6). Defendant's real concern with McGuigan, as it was with Joe Doran and others, was its obsession with so-called "fraudulent overtime". In fact, Melcher admitted during his deposition that the company's real concern was that the overtime McGuigan worked was "not justified" by the amount of work he was assigned. (Ex. 12 at 212). Rodrigue also stated the company was concerned whether or not it was "real overtime." (Ex. 9). Rodrigue further conceded that McGuigan may have told him that the reason he was working more than seventy hours a week was because Tim Moore was assigning him too much work and not honoring his light duty restrictions. (Ex. 9 at 82-83, 87). Defendant apparently was unaware or simply did not care that it took McGuigan longer to accomplish his assigned tasks because of his restrictions, and Dan Labrie had encouraged McGuigan to take as long as he needed to do his work. (Ex. 8).

Defendant even goes so far as to state that "At one point, Plaintiff complained that, if he wasn't allowed to work overtime, he was better off financially by just staying home and collecting workers' compensation payments." (Def. Memo at 4-5). This a blatant misrepresentation taken completely out of context. What Plaintiff communicated to Jeff Melcher, Rena Cater, Daniel Labrie and others was that he had agreed to ask his treating physician, Abraham Mintz M.D., to release him to return to work ahead of schedule, at Defendant's request and in reliance on its representations and descriptions of the light duty assignments to be provided, when he could have stayed at home

collecting benefits.  McGuigan received no financial benefit from returning to work ahead of schedule, but did so in good faith only to find himself the victim of continuous harassing and retaliatory misconduct.  Rena Cater's own notes of a conversation with McGuigan on March 5, 2001 shows that McGuigan complained about working "71 hours last week", that he "reminded him [Tim Moore] I am on Light Duty.  He says that doesn't mean you get to work whenever you want."  (Ex. 11). It defies belief that McGuigan would complain about working 71 hours and remind his supervisor and others that he was supposed to be on light duty if he was working such long hours voluntarily.  Nor does it make sense in light of McGuigan's statement to Cater that "I don't feel like working. No one knows how bad it is.  I want to lodge a formal complaint, someone needs to help him to back off. . . I want him to "leave me alone.'"  (Id.)  Moreover, Norm Rodrigue conceded that McGuigan may well have told him, as McGuigan claims, that he was working such long hours because Tim Moore told McGuigan that he needed to work those hours, or at least complete certain assignments regardless of how long they took. (Ex. 12 at 202).

Defendant also claims that "The Company attempted to obtain HMO coverage for Rhode Island residents working in Connecticut, but could not do so until January 2002 because there was not a large enough group of Rhode Island employees to obtain cost-effective coverage."  (Def. Memo at 6).  Despite Plaintiff's repeated requests, however, Defendant has not produced a shred of testimonial or documentary evidence as to what these "attempts" entailed, who was contacted, what it considers to be "cost-effective"

coverage, or any other facts to support its conclusory statements. The facts do

demonstrate, however, that McGuigan was informed in early 2001 that the insurance

issue had been "tabled." (Ex. 6, Ex. 35). The facts also demonstrate that McGuigan's

wife, Melinda, provided Rena Cater with the name of a company, United Healthcare,

that would provide HMO coverage to groups of three. (Ex. 18). Cater offered to follow

up on this lead but was specifically ordered not to by John Fallona. (Ex. 11). The

Rhode Island Insurance Department has confirmed that not only did United Healthcare

offer coverage to groups of three employees in 2000 and 2001, but so did Excellus Blue

Cross/Blue Shield, who presently provides coverage to McGuigan and others Rhode

Island residents, as well as other companies. Plaintiff urges that summary adjudication

on such a record would be entirely improper.


**B.    DEFENDANT'S WORDS, ACTIONS AND CONDUCT AMOUNTED TO AN
IMPLIED CONTRACT OF EMPLOYMENT**

It is well settled in Connecticut that an employer's words, actions and conduct

can amount to an implied contract of employment between the employer and an

employee. It is similarly well settled that statements in an employee handbook or

similar publication can give rise to such an implied contract, alone or in combination with

other "words, actions and conduct". Finley v. Aetna Life & Casualty Co., 202 Conn.

190, 213-14 and n.5 (1987); Magnan v. Anaconda Industries, Inc., 193 Conn. 558, 564

(1984). In this case, Defendants repeatedly published handbooks, codes of conduct,

13

and other documents which stated that the company would follow a policy of progressive discipline and that required employees, particularly supervisors, to report any suspected misconduct without fear of retaliation or reprisal. In addition, McGuigan, Clouston and others were trained in the use of these policies by Cater and others. Cater's notes of the "investigation" reveals that one subject of inquiry was whether or not Defendants progressive discipline and other policies were being followed in Connecticut. (Ex. 14). In fact, the written warning McGuigan received as a result of this "investigation" stated flatly that "We adhere to a policy of progressive discipline." (Ex. E-1). Contrary to these contractual promises, Defendant not only failed to provide the promised progressive discipline but intentionally retaliated against him for reporting suspected violations of its published policies.

Defendant is correct that employers in Connecticut can protect against implied contract claims by "(1) eschewing language that could reasonably be construed as a basis for a contractual promise; and/or (2) including appropriate disclaimers of the intention to contract." (Def. Memo at 10) (citations omitted). Unfortunately for the Defendant, it did neither. As set forth above, the company repeatedly published documents to McGuigan and other employees reinforcing its policies of progressive discipline for just cause only, and the requirement that employees report suspected violations of company policies upon the express guarantee of no retaliation or reprisal.

14

1. __PLAINTIFF HAS DEMONSTRATED A MEETING OF THE MINDS__

Again, Defendant correctly states that in order for an implied contract to exist, there must be a sufficient "meeting of the minds". (Def. Memo at 11) (citations omitted). Defendant's argument, however, that, "here, there is no evidence that the Company intended to be contractually bound to its employees", Id., is unavailing. Defendant's own Exhibit E-1 states in clear and unambiguous language that, "We adhere to a policy of progressive discipline." (Ex. E-1). McGuigan received this on March 7, 2001, just one month prior to his wrongful termination. Defendant has produced no argument, let alone any evidence, that Defendant's policies changed between March 7, 2001 and April 18, 2001. Rena Cater also confirmed in her deposition that Central Main Power's ("CMP") code of conduct applied to all employees, including McGuigan, and that Union Water & Power Company's ("UWP") Harassment Policy expressly prohibited any retaliation for reporting conduct that an employee felt was harassing or otherwise inappropriate (Ex. 11 at 23, 29-30). Energy East ("EE") had its own code of conduct and even provided a compliance officer, Larry Lashomb, to help interpret and implement its policies by January of 2001. (Id. at 113). In fact, Chris Clouston was reprimanded for allegedly not following corporate compliance and all three of the individuals accused of misconduct, McGuigan, Clouston and Moore were supposed to "receive a copy of the corporate compliance policy and specially attention drawn to the harassment and retaliation section" (Id. at 142-144), as well as a meeting to reinforce the corporate compliance policies (Id.). At no time did the company ever indicate to McGuigan that

15

its corporate compliance policies, Codes of Conduct or similar documents were optional, merely guidelines or subject to suspension at the company's whim. To the contrary, the company repeatedly emphasized that these were policies that must be followed, and applied equally to everyone employed by Defendant. As a supervisor, McGuigan was told repeatedly, during training sessions and otherwise, that he needed cause to discipline an employee, in addition to written documentation. McGuigan was also taught that he was required to follow Defendant's policy of progressive discipline with regard to the employees he supervised. McGuigan, as well as other supervisors, locators and other staff were trained in following Defendant's various policies and procedures. (Ex. 6, 7, 15, 19, 23, 24, 26, 27, 32.)

Norm Rodrigue, Jeff Melcher, Dan Labrie and John Fallona, all agree with Cater that Defendant adhered to a policy of progressive discipline and that Defendant's policies prohibited any form of retaliation against an employee for reporting suspected violations of company policies. (Ex. 9 at 58, 113-114; Ex. 8 at 324; Ex. 12, Vol. II at 86; Ex. 13 at 41, 77, 85, 94, 106.) In fact, John Fallona, the President of Union Water & Power, makes it clear that he was aware that "the company did have a progressive discipline policy which applied to all employees" (Ex. 13 at 77), and that "it takes just cause to terminate somebody in most cases" (Id. at 94). Contrary to Defendant's assertion that "Plaintiff's only argument appears to be that there must be a contract because he believed there was a contract" (Def. Memo at 12), Cater, Melcher, Rodrigue, LaBrie and Fallona all agree that an implied contract existed which included

16

progressive discipline, for documented cause, and which prohibited harassing and retaliatory conduct. Thus, McGuigan's understanding that he could only be terminated or otherwise disciplined for just cause, in accordance with Defendant's progressive discipline policy, and that he was required to report any suspected violations of company policies with an absolute guarantee of no retaliation for so doing was shared by Defendant's management, up to and including the President of UWP, John Fallona. This evidence clearly demonstrates the "meeting of the minds" which Defendant currently attempts to disavow.

Fallona also made it clear that because the Company adhered to a progressive discipline policy, somebody would have had to review the disciplinary records of McGuigan, Clouston and Moore, "in progressive discipline, the level of discipline really amounts to what he may have had other things that have happened to him, too. I mean it becomes progressive so someone would have had to review that." (Fallona depo at Ex. 13 at 106). Nonetheless, despite the fact that Moore had previously received a warning for almost identical misconduct in the past, while neither McGuigan nor Clouston had ever been reprimanded previously, all received written warnings. Moreover, despite the fact that Sheila Ward, Rosa Benitez and others complained about Moore's harassing misconduct he, unlike McGuigan and Clouston, was never demoted or otherwise disciplined.

A review of the personnel files of McGuigan, Clouston and Moore would have revealed that neither McGuigan nor Clouston had any previous disciplinary history

whatsoever. Moore, on the other hand, had previously been warned for using inappropriate, vulgar language when discussing a subordinate with his supervisor. (Ex. 12 at 38-40.)[2]   This reinforces the information supplied by McGuigan, Clouston and John Topa (another supervisor) that Moore used inappropriate, vulgar language, including references to female anatomy, and that "it happens every day with Sheila (Ward) right there." (Ex. 14.) McGuigan informed Cater, Melcher and others that Moore regularly commented about female anatomy, including that of Sheila Ward and Melinda McGuigan. The notes of the "investigation" produced by Defendant do not reflect that anyone spoke to Sheila Ward to confirm these allegations. Sheila Ward, however, contacted Rena Cater directly to report Moore's inappropriate language and conduct at or around the time of the investigation.[3]  (Ex. 11) Upon information and belief, Lynn Toussaint and another representative came down to Connecticut and interviewed Ward prior to McGuigan's demotion. Nonetheless, despite the fact that Moore had previously been warned for his use of inappropriate, vulgar language, all three received virtually identical warning letters. Moore's warning letter did contain the following language, "For your further edification, retaliation is also not tolerated in relationship to any investigation or allegations that are made where employees feel offended, threatened or intimidated." McGuigan's warning, by contrast, stated, "For your information, retaliation is also not tolerated in relationship to any investigation or allegations that are made

---

[2] Plaintiff's attempts to obtain Tim Moore's personnel file have been unsuccessful.
[3] Plaintiff's attempts to obtain Rena Cater's notes of this conversation as well as other documents concerning Sheila Ward's complaints have proven unsuccessful.

where employee's feel offended, threatened or intimidated." (Ex. E-1). According to Cater, it was Defendant's Assistant General Counsel, Joseph Fay, who drafted the "For your further edification" language. (Ex. 11 at 127-28.) As such, it would appear that Moore had previously been warned that retaliation was not tolerated. Nonetheless, there is ample evidence that Moore and others continued to retaliate against McGuigan, Clouston, Rosa Benitez, Sheila Ward and others even following Moore's receipt of the warning on March 7, 2001. Clouston and McGuigan were demoted shortly following the issuance of the warning letters. Moore, of course, was not.

## 2. THE EMPLOYEE HANDBOOK PROVIDED TO McGUIGAN CONTAINED NO "DISCLAIMER"

The Employee Handbook provided to McGuigan, and produced to Defendant's in discovery, contains no "Disclaimer". (Ex. 15). The language that Defendant relies on as a "Disclaimer" (Ex. 3 to Toussaint Affidavit) quite simply was not attached to the handbook provided to McGuigan. Moreover, Defendant's reliance on Toussaint's affidavit, which purports to be based on "personal knowledge" is unconvincing. While Toussaint states under oath that the Employee Handbook "has at all times during the Plaintiff's employment with the Company contained a disclaimer," she neglects to inform the Court that she herself did not join the company until March of 2001, more than a year after McGuigan was hired and given his handbook. Plaintiff is at a loss to understand how Toussaint can have "personal knowledge" of events which predate her employment with the Company. Moreover, the "Disclaimer" relied upon by Defendants

19

(Ex. 14 at EE00005), is part of a document which didn't even come into existence until some time in 2001.  (See Ex. 14 at EE00001 – 00005.)  The Handbook provided McGuigan and upon which he continued to rely, contained no such "Disclaimer".  Even if McGuigan were subsequently provided a handbook which attempted to disclaim contractual reliance, such a "disclaimer" would be ineffective with regard to McGuigan, at least absent some additional consideration.  Torosyan v. Boehringer-Ingelheim Pharmaceuticals, Inc., 234 Conn. 1, 11, 13-14, 17, 19-20 (1995).  The fact that McGuigan continued working, in and of itself, would be insufficient as a matter of law to make the "new" handbook binding upon McGuigan, and the prior handbook would continue to govern McGuigan's employment.  Torosyan, 234 Conn. 1, 19-20.  This is the same rationale that led this Court to determine, as a matter of law, that a subsequent "disclaimer" was an ineffective attempt to modify the parties' employment contract.

    3.    THE "DISCLAIMER" CITED BY DEFENDANT IS ANYTHING BUT

    To be effective, a disclaimer must be unambiguous and clear that the employer is disavowing any contractual relationship with the employee.  The "disclaimer" cited by Defendant as Exhibit D A-3 is not labeled a disclaimer, but comes under the title "Preface".  There is nothing to indicate that Defendant ever explained the purported "at-will" nature of his employment to McGuigan.  Indeed, Defendant apparently failed to inform its own President, Vice President, General Manager, Human Resources Representative and Risk Manager of the purported at-will nature of its employment

20

relationships. Characteristics such as the location of the disclaimer in the handbook and the size and typeface of its print are factors to be taken into account. To be effective, a disclaimer must be sufficiently obvious as to be readily observable to any employees reviewing the manual. Cordora v. Aetna Life & Casualty, 1998 WL 246634 *5, (D.Conn. 1998); Smith v. Shoreline Care, 1996 WL 365015 *4 (Conn. Super. May 17, 1996); Wasilewski v. Warner-Lambert Co., 1995 WL 373928 *3 (Conn. Super. June 9, 1995). The language cited by Defendant does not meet these requirements. The language does not appear on the first page of the handbook, the at-will language is not in bold typeface nor otherwise prominent, and it is not labeled as a DISCLAIMER. McGuigan was not asked to sign an acknowledgment that he had read and understood the contents of the handbook, or that he understood his employment would be on an at-will basis and that he could be terminated at any time for any reason or no reason at all.

Nor does the "applicant's statement" cited by Defendant act as an effective disclaimer. Again, the "at-will" language is not in bold typeface nor otherwise prominently displayed, nor is it labeled a disclaimer. In addition to these infirmities, the statement was part of an application for employment signed prior to McGuigan becoming an employee of Defendant. Moreover, the statement specifically states that subsequent written documents and conduct can change the at-will nature of the relationship, if one ever existed at the time and was not "otherwise defined by applicable law." McGuigan did not become an employee until February of 2000, when he underwent a two-week orientation period with the company and received his employee

handbook which contained promissory language and no attempt to disclaim a contractual relationship. McGuigan subsequently received training in the implementation of Defendant's progressive discipline policy as well as additional publications, such as Energy East's Code of Conduct attached as Defendant's Exhibit A-4, which also contained promissory language and no attempt to disclaim contractual liability. Presumably, Defendant's Human Resources representative, Rena Cater was familiar with McGuigan's employment status when she informed him, "We adhere to a policy of progressive discipline" in February of 2001. (Defendant's Ex. E-1.) Cater's deposition testimony also demonstrates that the reprimands issued to McGuigan, Clouston and Moore were reviewed by Defendant's legal counsel, Joseph Fay, who apparently also approved of Cater's statement that the company adhered to a policy of progressive discipline. (Ex. 11 at 127-28). Plaintiff urges that Plaintiff has met his burden of demonstrating at least a genuine issue of material fact as to whether an implied contract of employment existed between the parties. As such, summary adjudication would be improper.

Even assuming, *arguendo*, that the Court chooses to give some weight to the purported "disclaimer", at best this would create a genuine issue of material fact as to whether such a "disclaimer" was sufficient to overcome the previous and subsequent words, actions and conduct of the company which support Plaintiff's claim that an implied contract of employment existed between the parties. Vermont's Supreme Court has recently added to a long line of cases that hold when an employer presents

22

conflicting "mixed messages" to its employees, the issue should be decided by a jury. The Court noted that despite containing an all-capitals disclaimer on page one, the employee handbook in question also contained "an elaborate system governing employee discipline and discharge" which "are inconsistent with the disclaimer at the beginning of the manual, in effect sending mixed messages to employees." Dillon v. Champion Jogbra, 172 Vt. ___ (2000-560) (2002). In this case, even if the "disclaimer" and/or "applicant's statement" are credited, at best this creates a "mixed messages" situation which should be resolved by the jury.

C.   PLAINTIFF HAS PRESENTED SUFFICIENT EVIDENCE TO SUPPORT A CAUSE OF ACTION FOR NEGLIGENT MISREPRESENTATION.

Defendant negligently misrepresented to Plaintiff that he would be provided with a choice of health insurance options, including HMO and PPO coverage. Defendant further misrepresented that he would be provided such benefits "within six months". Defendant also negligently misrepresented to Plaintiff that he would not be retaliated against for reporting suspected violations of Defendant's polices and procedures or other wrongdoing. In addition, Defendant also negligently misrepresented to Plaintiff that it would fully and fairly investigate such claims, as well as any claims of harassment or other misconduct made against him. Plaintiff also negligently represented to Plaintiff that he would be provided light duty work upon his return to in February 2001 following surgery to repair herniated discs resulting from his workplace injuries sustained on September 8, 2000.

23

Defendant does not even attempt to deny that it made such statements, or that it did so negligently. Instead, it relies on the false assumption that McGuigan was an at-will employee and that any reliance on these representations would have been unreasonable. As set forth above, this premise is faulty and therefore unavailing. Defendant's claim that plaintiff has not suffered ant pecuniary loss is similarly unavailing. First of all, Plaintiff was demoted, with a resultant decrease in his hourly compensation, in direct retaliation for bringing forward suspected violations of Defendant's published policies and procedures. Plaintiff also incurred medical expenses which he would not have had if Defendant had honored its promises. McGuigan and other members of his family also put off seeking necessary medical care in reliance on Defendant's representations that the promised health insurance coverage would be forthcoming. Plaintiff also testified that he declined opportunities to pursue other employment as a result of Defendant's misrepresentations. Finally, Plaintiff's injuries failed to heal properly as a direct result of Defendant's failure to honor his light duty restrictions, as noted by Dr. Mintz in his report dated May 1, 2001. (Ex.    ). This not only caused Plaintiff to undergo further surgeries and other medical procedures and to miss additional time from work, but also resulted in permanent injuries and a permanent reduction in his work capacity. All of these pecuniary losses flowed directly from Defendant's negligent misrepresentations, in addition to the emotional distress, attorney's fees and other costs incurred by Plaintiff.