**D.    PLAINTIFF HAS PRESENTED MORE THAN SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIMED VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

An implied covenant of good faith and fair dealing is, by law, a part of every contract in Connecticut. As demonstrated above, an implied contract of employment existed between the parties. The case law cited by Defendant's is not applicable in this situation, but applies only to true at-will employees. Moreover, in the same breath that Defendant argues that Plaintiff cannot pursue a claim based upon the implied covenant because he has remedies available under ERISA and other statutes, it is arguing that Plaintiff does not have valid claims, and hence no remedies, under those same statutes. Defendant's inconsistent and contradictory arguments demonstrate the weakness of Defendant's position. Defendant's representatives conceded during their depositions that they were all well aware that harassment, discrimination and retaliation was not only precluded by Defendant's policies and procedures, but are unlawful and against public policy, not just in Connecticut but "in every state." (Facts, ¶21). There is ample evidence that McGuigan was unfairly harassed, demoted and retaliated against for a variety of reasons which contravene established and recognized public policy, not all of which are covered by a specific statute providing adequate relief.

**E.    PLAINTIFF HAS PRESENTED MORE THAN SUFFICIENT EVIDENCE TO SUPPORT HIS PROMISSORY ESTOPPEL CLAIM**

Defendant argues that this claim must fail because there was no clear and definite promise and no reasonable reliance by Plaintiff. As discussed above, these

claims are unavailing. Defendant further argues that "Plaintiff signed an unambiguous statement acknowledging that he was an employee at-will and that he could not be offered any greater contractual rights without written approval by an authorized Company executive. No Company executive ever provided Plaintiff with the necessary written approval." (Def. memo at 16-17). As stated above, the "applicant's statement" was neither unambiguous nor legally binding. Moreover, Defendant's own exhibits demonstrate the fallacy of the statement that "No Company executive ever provided Plaintiff with the necessary written approval." Defendant's executives in fact continuously published written policies and procedures which made just such promissory statements, including codes of conduct, training materials and other documents which made no attempt to "disclaim" the company's intent to contract. Energy East's Code of Conduct includes a written introduction signed by its Chief Executive, Wesley van Schack. (Ex. A-4). In addition, Rena Cater stated in writing, that "We adhere to a policy of progressive discipline." (Ex. E-1).

As set forth above, McGuigan was not an at-will employee and reasonably relied on Defendant's promises and representations. Moreover, McGuigan not only relied upon Defendant's promises to his detriment by remaining employed with Defendant, but gave up the opportunity to pursue other opportunities, sacrificed his physical and mental well being, as well as that of his family, and jeopardized his long term health, work capacity, and ability to enjoy life's activities.

**F.    PLAINTIFF HAS PRESENTED MORE THAN SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIMED VIOLATIONS OF ERISA**

Defendant may be correct that "the company is under no affirmative obligation to offer health benefits to its employees" and "ERISA does not prohibit an employer from distinguishing between groups or categories of employees." (Def Memo at 18). However, ERISA does prohibit an employer from promising employees certain benefits in order to secure or maintain their employment, making false statements and representations about the benefits to be provided, and retaliating against an employee for reporting a suspected violation of ERISA either internally or to the Department of Labor.  If Defendant had told Plaintiff that it was going to offer HMO and PPO coverage only to its employees who both lived and worked in Connecticut, McGuigan could have considered this information in deciding whether he wanted to accept and maintain his employment with Defendant, and there would be no issue.  It is undisputed that the company communicated to McGuigan, both orally and in writing, that it would provide him with a choice of health insurance plans, including HMO and PPO options.  It is also undisputed that he was promised that said insurance plans would be in place "within six months."  Both Rena Cater and Marjorie Heimboldt acknowledged that they had provided false and misleading statements to McGuigan and others concerning the insurance situation.  (Ex. 18, 28).  Rena Cater also predicted, apparently correctly,  that her involvement in trying to get the company to acknowledge and correct its mistakes would probably cost her her job.

1.   **Plaintiff was denied the benefits to which he was entitled under the plan in violation of ERISA Sec. 502(a)('l).**

Defendant cites to *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492 (2nd Cir 1988), for the proposition that the promises admittedly made by Defendant are insufficient to modify the written plan, entitling Plaintiff to benefits. *Moore,* however, dealt with a pension plan, not a health insurance plan. The court's concern that "[p]redictability as to the extent of future benefits would be lost" is not a factor with regard to an employee benefit plan like the ones at issue in this case. Unlike pension plans, which involve actuarial calculations and may require an employer to incur substantial costs in the future, an employer's sole obligation with regard to a health insurance plan is to pay its portion of the monthly premiums. Courts regularly distinguish between employee welfare plans such as pensions, and employee benefit plans, such as health insurance coverage, for this very reason. Indeed, the very language cited by Defendant shows the court limited its holding to welfare plans, "absent a showing tantamount to proof of fraud, an ERISA **welfare plan** is not subject to amendment as a result of informal communications between an employer and plan beneficiaries." (Def Memo at 19-20, citing *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492) (emphasis added). The Ninth Circuit has recognized a plaintiff's right to pursue an ERISA claim based upon an employee's reliance on oral promises that he would be eligible for benefits under an ERISA plan, particularly where, as here,

28

the employee was induced to accept the employer's offer of employment because of the employer's representations. <u>Spink v. Lockheed Corp.</u>, 125 F.3d 1257 (9th Cir. 1997).

### 2. <u>Defendant violated its fiduciary duty under ERISA Sec. 502(a)(3), 29 U.S.C. Sec. 1132 (a)(3).</u>

Defendant promised Plaintiff that he would be provided a choice of health insurance options, including HMO and PPO coverage.  McGuigan was promised that he would have this coverage within six months.  These statements were Made by Rena Cater, defendants human resources representative who was responsible for communicating with On-target's employees regarding health insurance and other benefits issues; Marjorie Heimboldt, who was responsible for procuring health insurance benefits for McGuigan and other employees who fell under the umbrella of Central Maine Power's benefits coverage; and in various publications provided to McGuigan by the company.  Clearly, Cater and Toussaint had a fiduciary duty to provide McGuigan with complete and accurate information.  Instead, McGuigan was provided with false and misleading information and did not receive the promised benefits until January, 2002, and only after he retained legal counsel and initiated the instant action.  Finally, McGuigan clearly relied to his detriment on these promises by foregoing other employment opportunities both prior to and during the course of his employment with Defendant.  Defendant's statement that, "Here, there is no evidence that Plaintiff rejected any other job offers of forewent seeking other employment opportunities based on Cater's statements" (Def. memo at 24) is simply not true. (Ex. 6).

29

Plaintiff decided to accept the position with Defendant based, at least in part, on the promised benefits.  Plaintiff also decided not to pursue other opportunities based upon those same representations.

### 3. Defendant discriminated and retaliated against Plaintiff in violation of ERISA Sec. 510, 29 U.S.C. Sec. 1140.

Defendant states that "In the absence of direct evidence. . . an ERISA Sec. 510 retaliation claim is analyzed according to the familiar *McDonnell Douglas* burden shifting approach" (Def Memo at 25-26).  While that may have been a correct statement of the law at the time it was written, its continued validity is called into question by the Supreme Court's recent decision in <u>Desert Palace, Inc. v. Costa</u>, No. 02-679, Decided June 9, 2003.  While <u>Costa</u> dealt with a claim under Title VII, its reasoning is equally applicable to a claim under ERISA Sec. 510.  Moreover, contrary to Defendant's assertions, there is direct evidence to support McGuigan's claim that he was discriminated against and demoted in retaliation for pursuing his rights under ERISA and specifically for writing a letter to the United States Department of Labor.  Plaintiff has presented more than sufficient evidence to support his claims under either the *McDonnell Douglas* or *Price Waterhouse* standards.

Defendant's position appears to be that even if it discriminated against and demoted McGuigan in direct retaliation for writing to the Department of Labor or otherwise

30

pursuing his complaints regarding insurance coverage, no liability would attach.[4] In support of this novel argument Defendant cites a single unreported decision from the Northern District of Illinois. Defendant argues that "expressing dissatisfaction with his health care coverage where there is nothing that could reasonably constitute an ERISA violation is insufficient to bring a plaintiff within the class of persons protected by section 510." (Def Memo at 27). However, the evidence demonstrates that Defendant did not treat McGuigan's complaint as unreasonable. First of all, Rodrique had Cater contact McGuigan to find out which specific section of ERISA it had violated. (Facts, ¶¶45-47) Next, it demoted McGuigan with weeks of receiving a copy of his letter to the Department of Labor. (Ex. 35.) Moreover, Defendant's agents concede that McGuigan's complaints about insurance coverage and ERISA violations made them angry and contributed to his demotion (Facts, ¶20). While Defendant implies that McGuigan may only have "**claimed** to have sent [the letter] to the Department of Labor" (Def Memo at 27) (emphasis added), Plaintiff produced the green card showing receipt of the certified letter in response to Defendant's discovery requests (Ex 35). Moreover, Rodrique, one of the purported decision makers, testified that he did not know himself whether or not the company was in violation of ERISA, confirming that Plaintiff's good faith belief was in no way unreasonable. (Facts, ¶46). This is confirmed by the fact that the Connecticut Commission on Human Rights and Opportunities, and others, led

---

[4] In the unlikely event that the Court should adopt Defendant's reasoning, such a finding would undermine Defendant's argument in Section III D. that Plaintiff's claimed breach of the implied covenant of good faith and fair dealing should be dismissed because he has a statutory remedy available under ERISA.

McGuigan to reasonably believe that Defendant's conduct was indeed in violation of ERISA.

### 1. Plaintiff has made out a prima facie case

Defendant argues that "the familiar McDonnell Douglas burden shifting approach" should be applied to Plaintiff's claims of retaliation and discrimination in violation of ERISA Sec 510 and C.G.S. Sec 31-290a. In light of the substantial direct and circumstantial evidence supporting these claims, and the Supreme Court's recent decision in Morgan, it is far from a foregone conclusion that such an approach is appropriate. Assuming, however, *arguendo*, that Defendant is correct, Plaintiff has nonetheless more than met his burden.

### a. McGuigan is a member of the protected class

Defendant concedes that "McGuigan made no secret about his dissatisfaction with his health insurance coverage, and even went so far as to send to the Company a copy of a letter he claimed to have sent to the Department of Labor." (Def. Memo at 27). Plaintiff not only "claimed" to have sent the letter, but also produced it to Defendant in discovery the green card evidencing receipt of the letter by the Department of Labor. (Ex. 35). Shortly thereafter, McGuigan was demoted. Plaintiff vigorously disputes Defendant contention that "the conduct complained of could not reasonably be construed as a violation of ERISA." Reporting a suspected violation of ERISA to the Department of Labor is a protected activity. A juror could reasonably infer that McGuigan's letter to the Department of Labor and his continuing attempts to address

32

the insurance situation lead directly to his demotion.  As such, McGuigan was clearly a member of the protected class.  It is undisputed that part of the reason for his demotion was that McGuigan "was not a team player" who complained about various issues.  Jeff Melcher, admitted that he was upset by the fact that McGuigan called the company's area coordinator, Sandy Sargeant, to discuss the insurance issue.  (Ex. 12).  Rena Cater repeatedly, and perhaps correctly, predicted that she "would probably lose my job" because of her involvement in the insurance issue, which she stated "violated her personal ethics."  (Ex. 18).  Cater was called on the carpet by UWP's president, John Fallona. as a result of expressing her opinion.  (Ex. 11).  Cater was also ordered by Fallona not to get involved in trying to remedy the situation when she offered to look into it. (Ex. 11).  Cater herself had her duties reduced around the same time that Clouston and McGuigan were demoted, reporting to Lynne Toussaint who was brought in form outside and being told that she would no longer be involved in investigating employee complaints. (Ex. 11).  Cater left the company shortly thereafter.  Cater herself may well have been the victim of unlawful retaliation.

### b.   McGuigan was qualified for the supervisor position.

The undisputed facts show that McGuigan was the first locator promoted to supervisor in Connecticut in April 2000.  He received several pay increases and bonuses following his promotion.  He received not one but two bonuses in December 2000 and January 2001, at least one of which was a discretionary bonus to recognize McGuigan's outstanding performance and his service "above and beyond the call of

duty. (Ex. 6, 9, 12, 20, 21, 22, 30).  McGuigan, who was already supervising the entire Eastern half of the state, was asked to assume responsibility for Southwestern Connecticut (Fairfield County) in late summer/early fall of 2000 when the company was in danger of losing its contracts with SNET and CL&P.  Although just one of three supervisors at the time, the others being John Topa and Dana Kelly, McGuigan was effectively supervising approximately three-quarters of the state.  It is also undisputed that the company asked McGuigan to train Chris Clouston when he was promoted to supervisor.  There is absolutely no documentation of any performance or disciplinary issues prior to the reprimand he received on March 7, 2001 in McGuigan's personal file or anywhere else.  Plaintiff has submitted affidavits from numerous employees attesting to the fact that McGuigan was an outstanding and well-respected supervisor, which more than outweighs Defendants' vague and conclusory allegations of undefined performance issues and alleged complaints from unidentified subordinates.   As the Second Circuit has noted, "[Plaintiff's] claim that his performance had remained acceptable is no more conclusory than [Defendant's] assertion that it had deteriorated".  Danzer v. Norden Systems, Inc., 151 F.3d 50, 57 (2nd Cir. 1998).  This is especially true at the summary judgment stage, as the Court must credit Plaintiff's evidence and find all inferences in his favor.  As such, summary adjudication would be improper based on the record.

Moreover, the Second Circuit has repeatedly stated that a plaintiff need only possess the minimum qualifications to make out a prima facie case, and performance is a

34

separate issue to be argued as part of the employer's claimed legitimate nondiscriminatory reason.  It is also far from "well settled" that "courts must accept an employers criteria" (Def Memo at 28), especially when those criteria are entirely subjective, vague, unsupported and can reasonably be viewed as pretextual.  As the Second Circuit has noted:

> "We further note that the district court seems to have attached undue significance to First Federal's claim that it merely exercised a good faith business judgment in terminating Montana ... where, as here, the Plaintiff claims not that her employer used poor business judgment in discharging her but that her employer used the structural reorganization as a cover for discriminatory action, a federal court, to ensure that the business decision was not discriminatory, is not forbidden to look behind the employer's claim that it merely exercised a business decision in good faith ... To hold otherwise would effectively insulate an employer from the constraints of federal anti-discrimination laws during any structural reorganization or reduction in force."

Montana v. First Federal S&L of Rochester, 869 F.2d 100, 106 (2nd Cir. 1989).

Defendant's arguments notwithstanding, the Court need not credit Defendant's stated explanations, particularly since, as a matter of law, all inferences must be drawn in favor of Plaintiff.  It is precisely because such credibility determinations are best made after a full hearing of all the facts at trial that the Supreme Court has warned that in deciding a summary judgment motion a trial court must disregard the favorable evidence to the moving party that the jury is not required to believe, and should give credence to the evidence of the non-movant and only so much of the "...evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses." Reeves v. Sanderson Plumbing Products, Inc.,

120 S.Ct. 2097, 2110 (2000). Defendant's reliance on the statements of Jeffrey Melcher and others, which are not only self-serving but in some instances contradicted by their own sworn deposition testimony, affidavits from disinterested witnesses, and other record evidence, is insufficient as a matter of law to warrant summary adjudication.

### c. McGuigan was demoted under conditions that support an inference of discrimination

As set forth above, McGuigan was first reprimanded and then demoted almost immediately after writing to the Department of Labor and communicating that fact to the company. McGuigan's demotion was admittedly motivated by his "complaints" and the fact that he was "not a team player." (Ex. 9 at 56, 65, 69-70.) Moreover, Defendant's contention that "the Company was shopping for better coverage" is directly contradicted by the statements made to McGuigan by Moore and Cater that the issue had been "tabled". Moreover, Cater concedes that she was directly ordered by Fallona not to assist in obtaining the coverage that had promised, was reprimanded for trying to assist the Rhode Island employees, and feared she would lose her own job as a result of her involvement with the issue. (Ex. 11.)

Defendant's "legitimate non-discriminatory reason" for demoting McGuigan, his purported "poor supervisory skills, failure to improve on operational issues, and failure to follow company directives" is vague, conclusory, entirely unsupported, and obviously contrived. Moreover, the Supreme Court has recently pointed out that "We have often

36

acknowledged the utility of circumstantial evidence in discrimination cases. For

example, in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000), we

recognized that evidence that a defendant's explanation for an employment practice is

"unworthy of credence" is one form of *circumstantial evidence* that is probative of

intentional discrimination." Desert Palace, inc. v. Costa, No. 02-679, Decided June 9,

2003. Defendant's claim that McGuigan was demoted for "performance issues" is so

unworthy of credence that it not only fails to defeat Plaintiff's claims, it actually supports

them. Summary adjudication would be entirely inappropriate on such a record.

### G.    PLAINTIFF HAS PRESENTED MORE THAN SUFFICIENT EVIDENCE TO SUPPORT HIS CLAIM UNDER C.G.S. §31-290a

Plaintiff has presented more than sufficient evidence to support his claim that he

was unlawfully demoted and otherwise retaliated against in violation of C.G.S. §31-

290a. C.G.S. §31-290a states, in pertinent part:

> No employer. . . shall. . . in any manner discriminate against any employee
> who has filed a claim for workers' compensation benefits or otherwise exercised
> the rights afforded to him pursuant to the provisions of this chapter.

Plaintiff has presented more than sufficient evidence that he was demoted and

otherwise discriminated against as a result of filing a claim for workers' compensation

benefits and otherwise exercising the rights afforded to him pursuant to the Connecticut

Workers' Compensation Act, including the fact that he was directly told that the reason

he was being demoted was because "you recently complained to the claims adjuster

that you're not being able to go to physical therapy." (Ex. 6 at 260). Defendant's

37

statement that "claims of retaliation brought under C.G.S. §31-290a are analyzed under the McDonnell-Douglas burden shifting framework" (Def. Memo at 30), is generally correct. Where, as here, there is direct evidence of Defendant's unlawful motive the more stringent Price-Waterhouse framework applies. This is especially so in light of the Supreme Court's recent decision in Morgan that even circumstantial evidence of a discriminatory motive for an adverse employment action is sufficient to shift the burden of proof to the employer. Under any standard, there is more than ample evidence of Defendant's unlawful retaliation, which continues unabated to this day.

Plaintiff suffered a work related injury on September 8, 2000. Prior to that he had been the first locator promoted to supervisor in Connecticut, received pay increases and bonuses, and was personally selected to supervise Southwestern Connecticut in addition to the entire Eastern half of the state when the situation in Fairfield County became so dire that the Company was in danger of losing its contracts to locate for its largest customers, SNET and CL&P. Following his injury on September 8, 2000, Plaintiff continued to supervise two territories, physically perform locates, interview employment candidates, and otherwise do everything asked of him by the Company, all while staying at the Holiday Inn in Bridgeport away from his wife and family. (Ex. 6.)

McGuigan continued to work up until his surgery on December 18, 2000, averaging in excess of 70 hours despite being in tremendous pain and discomfort. (Ex. 14). There is absolutely no evidence of any purported performance issues prior to McGuigan's surgery on December 20, 2000. Indeed, McGuigan received not just one

but two bonuses in December 2000 and January 2001. (Ex. 14).  Admittedly, McGuigan received these bonuses as a result of his performance from February to December 2000, and particularly August to December 2000.  Defendant concedes that not only were these bonuses based upon McGuigan's performance but that at least one of them was entirely discretionary, and awarded only in rare circumstances to recognize performance "above and beyond the call of duty." (Ex. 8, Ex. 9).  Following his return to light duty work in January of 2001, McGuigan somehow became the target of an investigation into alleged misconduct by another supervisor, Chris Clouston.  This occurred despite the fact that McGuigan had not been actively working for over a month, and had never been informed of any previous performance issues.

Immediately upon returning to light duty work in February of 2001, it became evident that the Company had no intention of honoring the representations made by Daniel Labrie and others, concerning the nature of his light duty position.  McGuigan's supervisor, after telling him that "you never should have come back, asshole", informed McGuigan in no uncertain terms that he was his supervisor and that McGuigan was to do what he was instructed to do "or else".  (Ex. 34).  Contrary to Defendant's promises that he could work as little or as much as he felt capable of, and could work from home if necessary, Moore assigned McGuigan an extensive work load from day one, including auditing locations throughout the state, which not only entailed extensive driving but required McGuigan to physically perform locates.  In fact, on his first day back to work, McGuigan was assigned an audit in Greenwich, Connecticut.  When McGuigan

questioned the appropriateness of these assignments given his light duty restrictions, Moore replied, "Dan Labrie might have light duty work, I don't have light duty." (Ex. 6, 8, 31).   When McGuigan voiced his concerns to Dan Labrie and Rena Cater, he was informed that these were "operational issues" and referred back to his supervisor Tim Moore.  Plaintiff tried to communicate his concerns that he was being harassed and retaliated against by Tim Moore, that his light duty restrictions were not being honored, and that he was unable to attend his scheduled physical therapy appointments because of the number of hours he was required to work and the fact that he was often far away from his therapist at the scheduled appointment times.  McGuigan attempted to discuss these concerns with Labrie, Cater, Jeff Melcher, Norm Rodrigue, Larry Lashomb and others, all to no avail.

Finally, the adjuster for Defendant's Workers' Compensation carrier, Debra Buettel, called McGuigan to see how he was doing.  McGuigan explained that his light duty restrictions were not being honored, that he was unable to attend his scheduled physical therapy appointments on account of his work schedule, and that he had attempted to bring these and other issues to Defendant's attention without result.  Debra Buettel called Dan Labrie and left a message that it was essential that McGuigan attend his physical therapy sessions in order to heal properly.  Shortly thereafter, Buettel and Labrie discussed these issues and Labrie said he would look into it.  Within a week, McGuigan was called to a meeting and informed that he was being demoted.  When McGuigan asked why, he was told he "wasn't working as a team with Tim" and "you

40

complained to an insurance adjuster and we're not going to put up with that." (Facts, ¶¶9-19).

It is difficult to see how Defendant has the temerity to even move for summary judgment based on these facts, which, of course, must be viewed in the light most favorable to Plaintiff. Plaintiff's testimony as to what took place with regard to his demotion is compelling evidence of Defendant's unlawful motivation. (Ex. 6). Plaintiff does not rely solely on his own testimony however. The evidence contained in the files of Defendant's Workers' Compensation carrier, the Travelers, as well as Debra Buettel's deposition testimony, convincingly supports Plaintiff's claims. (Ex. 10, Ex. 38)

**a.    Plaintiff has made out a prima facie case**

Defendant's arguments that Plaintiff has failed to make out a prima facie case are obviously contrived and completely unconvincing. Defendant first argues that Plaintiff has failed to produce evidence that would create an inference of discrimination. As set forth above, the evidence is so overwhelming that it is Plaintiff, rather than Defendant, who should arguably have moved forted summary judgment on this issue. Defendant argues that "It was not until April 18, 2001—<u>seven months</u> after he filed his workers' compensation claim – that Plaintiff was demoted". This argument is misleading at best. While Plaintiff disputes Defendant's contention that seven months is too long a time period to support an inference, especially in light of the complete facts and circumstances, that issue need not even be addressed in this case.   For example, Plaintiff exercised the right to take time off to recover following surgery, returning to

41

work in February 2001, just **two** months prior to the adverse employment actions. When Defendant refused to honor his light duty restrictions Plaintiff tried to vindicate his statutory rights. Plaintiff was demoted almost immediately after the company was informed by Debra Buettel that she had spoken with McGuigan and that the company needed to see to it that his light duty restrictions were honored and that he was allowed to attend his scheduled physical therapy appointments. Finally, McGuigan was told directly that the reason he was being demoted was because he "complained to an insurance adjuster".

As set forth above, Defendant's claim that it demoted McGuigan for poor performance is entirely unsupported, legally insufficient and obviously pretextual. While Defendant states that "following his written reprimand he continued to exhibit poor supervisory skills and intimidating conduct towards subordinates," the record is entirely devoid of any facts to support these unsubstantiated allegations. There is no evidence of any improper conduct by McGuigan between March 7, 2001, when he received his written reprimand, and April 18, 2001 when he was demoted. There were however, documented complaints from McGuigan, Sheila Ward, Rosa Benitez, and others that Tim Moore continued to harass and retaliate against his subordinates despite being reprimanded for such behavior and being told that such behavior would not be tolerated. There is no evidence that Moore was ever demoted or otherwise disciplined for his continuing inappropriate behavior, which was brought to the attention of Rena Cater, Jeff Melcher, Lynn Toussaint, Larry Lashornb and others.

42

The pretextual nature of Defendant's reliance on performance is perhaps best demonstrated that the company continued to contemplate terminating McGuigan for alleged "performance issues" even after he was taken out of work by Dr. Mintz on May 1, 2001 and was no longer "performing" any duties at all. For example, Labrie and Fallona met in July 2001 to discuss terminating McGuigan. Labrie testified that he scheduled the meeting to try to talk the company out of its plans to terminate McGuigan, and even brought in a third party from outside the company to help him make his case. (Ex. 8). Defendant has not even alleged, let alone produced any evidence, that McGuigan had any performance issues following his demotion on April 18, 2001. Clearly, the reason the company continued to discuss terminating McGuigan was that he once again exercised his right to stay out of work, on Dr. Mintz's orders, and receive temporary total disability benefits.

**H.    Plaintiff has presented more than sufficient evidence to support his claimed violation of C.G.S. Sec. 31-51q**

Defendant wrongly asserts that "McGuigan's Sec. 31-51q claim rests "solely on his allegations that he was demoted in retaliation for complaining about the Company's violation of ERISA." (Def Memo at 35). Defendant's attempt to rely on Plaintiff's response to an interrogatory to which he asserted timely and valid objections is completely unavailing. Plaintiff's claimed violation of Sec. 31-51q rests not only on McGuigan's exercise of his speech rights concerning health insurance and ERISA

43

issues, but his reporting being ordered to falsify time sheets, his reporting of improper

harassing and sexually harassing conduct on the part of Tim Moore, and other improper

practices being carried out on an almost daily basis by various agents and employees of

Defendant. Moreover, these issues pertained not only to McGuigan, but also to his

subordinates and other company employees, as well as to Defendant's clients,

contractors and the public at large.

Defendant's argument that these issues are not matters of "public concern" is

refuted by its own published documents which it submitted in support of its Motion:

> All information must be recorded accurately and reported honestly, completely
> and accurately. The integrity of Energy East's financial reporting process is vital.
> Reliance on our financial information by shareholders, regulators, lending
> institutions and others require a commitment from each employee to comply with
> Energy East standards of financial reporting. (Ex. A-4 at 31).

Rena Cater instantly recognized the impact of improperly recording hours, stating

"Great, we're defrauding the company of money" (Ex. 6, 7, 11). McGuigan recalls her

stating "Great, we're defrauding companies of money", which corresponds with Tim

Moore's statements that those costs would be passed on to SNET, CL&P and other of

Defendant's clients. (Ex. 6). In the end, however, there can be little doubt that the

improperly inflated costs would be passed on to the consumer, and that such issues are

therefore matters of public concern. Moreover, the fact that Defendants activities are

monitored and regulated by the State of Connecticut Department of Public Utility Control

further demonstrates that these issues are matters of public concern to the citizens of

the State of Connecticut. Code of Conduct states further that "shareholders, regulators,

lending institutions and others" could be effected by the types of misconduct reported by McGuigan:

> All information must be recorded and reported honestly, completely and accurately. The integrity of Energy East's financial reporting process is vital. Reliance on our financial information by shareholders, regulators, lending institutions and others requires a commitment form each employee to comply with Energy East standards of financial reporting. Each employee records or reports information in the course of their work. For example, you complete expense reports, **time sheets**. . .No employee should rationalize or even consider misrepresenting facts or falsifying records. (Ex. A-4 at 5).

In this day and age, following the events involving Enron, WorldCom, Xerox and others, it can hardly be argued that such matters are not of "public concern".

Defendant's arguments that Plaintiff "cannot establish that he was demoted <u>on account of</u> his exercise of such rights" and "the company has demonstrated that it had legitimate, non-discriminatory reasons for demoting Plaintiff" (Def. memo at 36-37) are even less convincing. As set forth above, the decision makers involved have conceded that McGuigan's speech was a motivating factor in his demotion, and Defendant's claims regarding McGuigan's supposed lack of qualifications and poor performance are conclusory, entirely unsupported, contradicted by the record, and obviously pretextual. Employees who refuse to turn a blind eye on wrongdoing by their superiors and "blow the whistle" are often the targets of retaliation precisely because they are not "team players" when the team is violating the rules. Plaintiff's only "performance issue" was that he was naïve enough to take the company at its word that it would investigate his complaints and concerns and would not retaliate against him in any way. It is clear that

McGuigan and Clouston were retaliated against and demoted because they brought forward what the company dismissively referred to as a "laundry list" of complaints.  The company allowed a hostile environment to exist in which employees were bullied, harassed and retaliated against without any means of seeking redress.  The atmosphere was such that employees feared losing their jobs for merely getting involved in reporting issues.  Even Rena Cater, Defendant's Human Resources Manager, feared for her job because of her involvement.  John Topa, another supervising lead, informed Rena Cater and Jeff Melcher as part of the "investigation" that he was instructed by Tim Moore that "Jeff has nothing to do with Connecticut.  All supervisors were told this at one of our supervisor's classes.  You do not call Jeff." (Ex. 14).  McGuigan also told Cater and Melcher, "I am to deal with Tim and only Tim and not to talk to Jeff Melcher.  That included talking to HR." (Ex. 14 at EE01711).  Topa also said of Moore, "he's not happy with Marshall-Marshall called Jeff – he made the wrong choice." (Id.). Cater herself observed firsthand the effect of Moore's bullying and retaliatory methods, noting that while she was interviewing John Topa, "Tim approached table while we were meeting, John looked nervous & anxious." (Id.).

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant's Motion for Summary Judgment should be denied in its entirety.

THE PLAINTIFF

BY _____
          Francis D. Burke
          Mangines & Burke, LLC
          1115 Main Street, Suite 708
          Bridgeport, CT  06604
          (203) 336-0887
          Fed. Bar No. ct18688

## **CERTIFICATION**

    This is to certify that a copy of the foregoing has been sent, via U.S. Mail postage prepaid, this _____ day of July 2003, to:

Patricia E. Reilly, Esq.
Christopher A. Kelland, Esq.
Tyler, Cooper & Alcorn, LLP
205 Church Street
P.O. Box 1936
New Haven, CT  06510-1910

_____
Francis D. Burke

47